JEROME E., Appellant, v COMMISSIONER OF SOCIAL SERVICES et al., Respondents.

First Department, February 4, 1993

## APPEARANCES OF COUNSEL

*Janet A. Chaplan* of counsel *(Gayle Lerner* with her on the brief; Lawyers For Children, Inc., *Law Guardian),* for appellant.

*Deborah R. Douglas* of counsel *(Fay Leoussis* with her on the brief; *O. Peter Sherwood, Corporation Counsel* for New

York City, attorney), for Commissioner of Social Services, respondent.

*Joseph T. Gatti* of counsel *(Reilly & Gatti,* attorneys), for McMahon Services for Children, respondent.

*Kao Pin Lew* for Joan E., respondent.

### OPINION OF THE COURT

Asch, J.

In this case we deal with a young child, Jerome, whom the mother, Ms. E., has willingly surrendered for adoption by a relative in a suburban setting in California. Jerome has been living now for almost a year in his new home, close by his two sisters who also live in California with another relative. We do not use the name of Ms. E., who herself moved for the severance of her legal relationship so that Jerome and the other children might live with some stability in their lives instead of remaining in foster care. This however is only to protect this young woman's privacy. Her actions with respect to her children, despite her mental illness, deserve only praise and approbation.

Contrary to the myopic optimism of Dr. Pangloss, this is not the best of all possible worlds, but perhaps, since Jerome and his two sisters will be living with relatives in close proximity to each other, there is basis for hope that his life will work out satisfactorily.

To paraphrase the words of Anna Quindlen *(Whose Best Interests,* New York Times, Dec. 9, 1992, at A23), we have tried "to marry humanity, discretion and statute" so that our "course of action now will leave the smallest hole in this little [boy's] heart in the years to come".

Jerome E. was born on November 22, 1988 to Joan E. Ms. E. voluntarily placed Jerome into foster care with McMahon Services for Children (Agency) on November 25, 1988. At that time, the mother was a psychiatric patient, hospitalized for severe depression.

At an early age Jerome was placed with a foster parent Maria R., a single mother of two biological sons, supported by public assistance. It was anticipated at that time that the children, Jerome, Jessica, and Jeanette would be returned to the mother upon her ability to locate an apartment and care for them. Throughout the placement period, Ms. E. consistently visited all her children and communicated regularly with the children's foster care agencies.

On July 8, 1989, Jerome's father died and the same month, Margaret Corliss, a 41-year-old paternal cousin of Jerome, and resident of Los Angeles, California, contacted the Agency and inquired of the status of the children. During this same time period, Mrs. Winnie Barclay, another paternal cousin, who lives close by Ms. Corliss in California, also expressed interest in planning for the children.

In November 1989, Ms. E. and an Agency caseworker met to discuss plans to discharge the children to the mother or in the alternative, to create a plan in the event she could not take the children back. Thereafter, in February 1990, the mother decided that Corliss should become Jerome's legal guardian.

In March 1990, the Commissioner filed a petition to change the plan to discharge Jerome to the mother to a plan to discharge him to the Commissioner for the purpose of adoption by Corliss, indicating that he had requested approval from California pursuant to the Interstate Compact on the Placement of Children. (Unbelieveably, it would take about a *year and a half* to get that approval.) He requested the court to review the foster care status of Jerome pursuant to Social Services Law § 392 and enter an order of disposition continuing foster care. In May 1990, the mother also decided to surrender Jessica and Jeanette for adoption by their foster parents because she feared that if she were hospitalized again the children would be required to again go back to foster care.

A foster care review hearing was conducted on June 19, 1990. Therein, the Agency informed the court that the plan was to discharge Jerome to his cousin in California and that the mother, although hospitalized, approved. The Agency also stated that the Interstate Compact study of Corliss had been initiated but not yet received. The court continued foster care for the next six months. On October 4, 1990, Jessica and Jeanette were removed from their foster home due to allegations of physical and verbal abuse by the foster mother. At the end of 1990, the mother agreed to allow Mrs. Barclay, the paternal cousin in California close to Ms. Corliss, and Mr. Barclay to care for Jessica and Jeanette.

On October 9, 1990, the Commissioner filed another petition requesting the court to review the foster care status of Jerome and to enter an order of disposition continuing foster care. At the hearing held on November 30, 1990, the court was informed that the Interstate Compact study still had not been received by the Agency. After a hearing held on May 17, 1991,

where the plan was again presented to the Court, foster care was continued due to the absence of the Compact study. On May 17, 1991, the Law Guardian was assigned to represent Jerome.

In July 1991, the Agency finally received approval for interstate placement of Jerome to Corliss. Thereafter, the Agency gave Jerome's foster mother a 10-day notice that Jerome would be removed from her home and that she had a right to a fair hearing. The foster mother did not pursue any administrative or judicial review of that decision.

However, the Law Guardian requested a foster care review hearing pursuant to Social Services Law § 392. The court granted that motion, and subsequently, on November 18, 1991, the foster care review hearing commenced. The mother, the Commissioner, and the Agency approved the plan to discharge Jerome to the Commissioner for the purpose of adoption by Ms. Corliss. However, the Law Guardian and the foster mother argued for the plan of continued foster care with the eventual goal of return to the mother. After the court noted that this plan was against the mother's wishes, the Law Guardian then stated that her plan was to discharge Jerome to the foster mother.

At the hearing, Margaret Corliss testified that she was willing to take custody of Jerome; that she was interviewed in California by a caseworker; that she was willing to permit Jerome's siblings visitation rights if Jerome's siblings were adopted by Mrs. Barclay, who also lived in California; that she lived in a one-family home with three bedrooms; that she had helped raise her three younger brothers; that she was never arrested; and that she made inquiries as to the children's whereabouts after her uncle's death. She also stated that she was self-employed. In addition, she testified that she had sent Jerome some toys but did not visit him because the Agency instructed her that it was unnecessary to do so. She stated that she had been attempting to acquire custody of him for two years.

Ellen Rubin, an Agency casework supervisor, qualified as an expert witness in social work, testified that it was best for Jerome to be discharged to Corliss; that if the court rejected the plan to discharge Jerome to Corliss the alternative plan would be to determine whether Mrs. Barclay would take Jerome; and that if Corliss was granted custody of Jerome, he would eventually adjust.

In court the next day, Ms. E., through her attorney, filed a formal surrender for adoption of Jerome pursuant to Social Services Law § 383-c. The Law Guardian opposed the surrender, stating that she intended to establish that the condition upon which the surrender was based, i.e., discharge and eventual adoption by Corliss, was not in Jerome's best interest. The court determined that a conditional surrender, provided it was legitimate, divested it of jurisdiction to proceed with the hearing, and that the Law Guardian and the foster mother were not parties to the surrender. It also stated, however, that it maintained some jurisdiction over Jerome until his adoption.

The mother advised the court that she had decided to surrender all parental rights to Jerome by placing him in the care of Corliss because she could not care for him properly and she "did not want him in the foster care system for the rest of his life". The mother acknowledged that she understood her rights with respect to the surrender and that she discussed the matter with her attorney and guardian ad litem. Corliss acknowledged that she read the conditions of the agreement and that she was prepared to file for adoption. The surrender was then executed. On February 27, 1992, Jerome was placed in the Corliss home.

The Commissioner agreed with the Law Guardian that the surrender of the care and custody of Jerome to the Commissioner did not divest the Family Court of jurisdiction to continue the foster care review, contrary to the finding of that court. However, whether or not the Family Court had continuing jurisdiction pursuant to Social Services Law § 392, that statute does not obligate the court to continue the foster care review hearing for the purpose of determining whether a condition of the surrender, pursuant to Social Services Law § 383-c, was in the child's best interest.

Social Services Law § 383-c, entitled "Guardianship and custody of children in foster care" outlines the procedures used in the execution of both judicial and nonjudicial surrenders. The surrender terminates parental rights and frees the child for adoption (see, Carrieri, Practice Commentaries, McKinney's Cons Laws of NY, Book 52A, Social Services Law § 383-c, 1992 Pocket Part, at 35). The section provides, in pertinent part, that "[t]he guardianship of the person and the custody of a child in foster care under the age of eighteen years may be committed to an authorized agency by a written instrument which shall be known as a surrender" (Social

Services Law § 383-c [1]). It further provides that the guardianship must be in accordance with the provisions of the article and that the instrument must be upon terms and subject to such conditions as may be agreed upon by the parties (Social Services Law § 383-c [2]). Moreover, the statute provides that: "The court shall enter an order either approving or disapproving the surrender. If the court disapproves the surrender, the surrender shall be deemed a nullity and without force or effect" (Social Services Law § 383-c [4] [f]). There is no provision requiring the court to hold a "best interests of the child" hearing as to the surrender, but only the general direction in this latter subdivision requiring the court to approve or disapprove the surrender.

Nothing in Social Services Law § 392 deals with the form or procedures applied in conditional surrenders, which, as noted, are outlined in Social Services Law § 383-c. Section 392 details the manner in which foster care status is to be reviewed, but does not contemplate the voluntary and conditional surrender of a child by the biological parent. Thus Joseph R. Carrieri in his Practice Commentaries on the new section 383-c notes: "There was a time when conditional surrenders were frowned upon, but social service districts and the courts look more favorably upon conditional surrenders and open adoptions" (Carrieri, op. cit., at 36). While the procedures of section 392 do not apply, those of section 383-c requiring the court to "approve or disapprove" the surrender do. While a full "best interests" hearing is not mandated, the Legislature, since it has given the court the power to veto the surrender, has also impliedly given the court the responsibility of reviewing whether the surrender is appropriate under the individual circumstances.

In any event, the Family Court conducted much more than a perfunctory review in this case. We have noted the testimony at the section 392 foster care review hearing, given before the mother executed the surrender pursuant to section 383-c, at some length above. A review of this testimony shows that the Law Guardian was permitted to cross-examine Ms. Corliss extensively. While the hearing was adjourned and then terminated before the Law Guardian could cross-examine the casework supervisor, the attorney for the foster mother, whose plan and position were essentially the same as the Law Guardian, did have an opportunity to conduct such a cross-examination of the supervisor. Further, although the Law Guardian maintained she had been precluded from offering

the testimony of a psychiatrist as to the detrimental effect of Jerome's removal from the home of Ms. R., the foster parent, on February 13, 1992, when the court heard oral argument on the Law Guardian's application for a stay, it commented that the psychiatrist's affidavits were "extraordinarily brief" and that they were "unpersuasive in there [sic] lack of specifics in detail".

■ The contention by the Law Guardian that the court improperly lowered the "best interests" standard of review in the section 392 hearing when it stated it had only to determine whether the Commissioner's plan was "adequate", rather than determining which plan was "more adequate", misinterprets the Family Court's statement. Rather than assert it would use an "adequacy" standard, the court was simply noting that it had to consider the "appropriateness of the plan" submitted by the Commissioner (Social Services Law § 392 [5-a] [a]), and was not required to hear the Law Guardian's plan for Jerome. In any event, the Law Guardian in proposing that Jerome remain in foster care was not presenting a "plan" to the court, but simply opposing the Commissioner's plan.

Further, contrary to the contention of the Law Guardian, while it might have been appropriate for the court to appoint her as the Law Guardian in the surrender proceeding, such an appointment is discretionary (Family Ct Act § 249), and under the circumstances herein, there was no abuse of that discretion, in the court's refusal.

We have examined the remaining contentions of the appellant and find them to be without merit.

■ In summary, the Family Court was presented with a plan concurred in by the Commissioner and the biological mother for an interested relative, Ms. Corliss, to adopt the child. Yet another relative, who was adopting two other siblings of Jerome, lives very close to Ms. Corliss in California, so the children would be able to meet. Ms. E., who is suffering from mental illness, exhibited a great deal of interest and care for Jerome (and the other children). Giving them up for adoption, even to relatives, must not have been an easy step for this young woman to take, but it *was* taken so that there might be finality and stability in her children's lives. Opposing this, the Family Court was presented with a "plan" to continue Jerome in foster care indefinitely. We do not have before us a completed section 392 foster care review hearing and

determination, but the record which is before us leaves no doubt that any such determination would have been favorable to the Commissioner and the mother's plan. While the review was interrupted by the mother's execution of the surrender to the Commissioner, the Family Court certainly had enough witnesses and testimony before it at that time to make an informed decision whether to accept or reject such surrender, pursuant to Social Services Law § 383-c.

Accordingly, the order of the Family Court, New York County (Jeffry H. Gallet, J.), entered on or about November 19, 1991, which terminated an ongoing foster care review hearing held pursuant to Social Services Law § 392 upon acceptance of a surrender of the subject child by his mother executed pursuant to Social Services Law § 383-c, denied appellant Law Guardian standing to represent the child in the surrender proceeding, and ordered that the child's care and custody be transferred to respondent Commissioner of Social Services for the purpose of adoption by the child's cousin, should be unanimously affirmed, without costs or disbursements.

CARRO, J. P., WALLACH and KASSAL, JJ., concur.

Order of the Family Court, New York County, entered on or about November 19, 1991, is unanimously affirmed, without costs or disbursements.